## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

DESIRA D. ROY,

        **Plaintiff,**

vs.                                **No. CIV 08-0341 RB/LAM**

LIEUTENANT JASON DAVIS, in
his personal and official capacity,
JAN GARTMAN,[1] Warden, in her
personal and official capacity,
and LEA COUNTY, STATE OF
NEW MEXICO, a COUNTY
MUNICIPALITY,

        **Defendants.**

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc.
54), filed on January 13, 2009.  Jurisdiction arises under 28 U.S.C. §§ 1331, 1343(a)(1), and 1367.
Having considered the submissions and arguments of counsel, relevant law, and being otherwise
fully advised, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND
DENIED IN PART**.

**I.       Procedural Background.**

On March 31, 2008, Plaintiff Desira Roy filed this civil rights action for money damages
under 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States
Constitution, Article II, Sections 10 and 18 of the New Mexico Constitution, and state law.  Ms. Roy
claims that Defendant Lieutenant Jason Davis subjected her to excessive force and violated her
substantive due process rights when he shoved her face into a concrete floor as she was booked into
the Lea County Detention Center ("LCDC") on December 23, 2007.

---

[1] The record indicates that the correct spelling of this Defendant's name is "Jann Gartman."  (Doc. 87-2.)

In her Amended Complaint, Ms. Roy alleges (1) use of excessive force in violation of the Fourth and Fourteenth Amendments; (2) use of excessive force under the New Mexico Constitution and state law; (3) violation of substantive due process under the Fourteenth Amendment; (4) municipal liability under §1983; and (5) intentional spoliation of evidence under state law.

The Court dismissed Plaintiff's claim for intentional spoliation of evidence on June 3, 2009. (Doc. 93.)  Defendants have moved for summary judgment on all other claims.

## II.    Summary Judgment Standard.

Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate "only where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006) (quoting Rule 56(c)).  When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Trainor v. Apollo Metal Specialties*, Inc., 318 F.3d 976, 979 (10th Cir. 2002); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  If this burden is met, the nonmovant cannot rest on the pleadings, but must set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim. *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (noting that, on summary judgment, the plaintiff can "no longer rest on the

2

pleadings")).

The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Evidence relied upon in opposition to summary judgment "may be insufficient to create a triable fact if it is nonspecific or otherwise non-responsive, vague, conclusory, or self-serving." *Piercy v. Maketa*, 480 F.3d 1192, 1197-98 (10th Cir. 2007).   The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

## III.    Statement of Facts.

Typically, the facts set forth at this point in a memorandum opinion and order would be done so in the light most favorable to Plaintiff.  *See Fuerschbach*, 439 F.3d at 1207.  The following statement of facts can hardly be said to cast Plaintiff in a favorable light, but all reasonable inferences are drawn in her favor.

On December 22, 2007, during a family gathering in Eunice, New Mexico, Ms. Roy drank Crown Royal and three types of tequila.  (Def. Ex. A, Dep. of Barbara Gross at 57; Def. Ex. C, Dep. of Desira Roy at 123-26.)  After arguing with her mother and her boyfriend, Ms. Roy called her grandparents and asked them to drive to Eunice to pick up Ms. Roy and her two-and-a -half-year-old son.  (Roy Dep. at 128-133.)  Ms. Roy and her son left the party with her grandparents in their Chevy Impala.  (Roy Dep. at 133.)

A few miles down the road, Ms. Roy realized she had forgotten her purse and cigarettes at her mother's house.  (B. Gross Dep. at 46.)  When her grandfather refused to turn the car around to retrieve the purse and cigarettes, Ms. Roy became upset and physically attacked him.  (B. Gross Dep. at 47; Def. Ex. B, Dep. of Dan Gross at 31.)  After her grandfather stopped the Impala on the

side of the road, Ms. Roy and her grandfather exited the vehicle and started to scuffle.  (D. Gross Dep. at 31.)  Ms. Roy bit her grandfather on the cheek and the arm. (D. Gross Dep. at 31.)  As her grandfather tried to stop Ms. Roy from biting him, they fell to the ground and wrestled around in the dirt.  (D. Gross Dep. at 31.)

Ms. Roy's grandmother remained in the Impala with Ms. Roy's son and dialed 911. (B. Gross Dep. at 50; 56.)  Ms. Roy's grandmother told the 911 operator that she and her husband needed help because they could not handle their "drunk granddaughter" who had "about killed" her grandfather.  (Def. Ex. K, Tr. of 911 call at 2-3.)  Ms. Roy's grandmother reported that Ms. Roy had tried to climb out of the car while it was moving, Ms. Roy had tried to kill both her grandparents, and that they had to hold Ms. Roy down.  (Def. Ex. K at 3-4.)  The 911 operator could hear Ms. Roy screaming in the background.  (Def. Ex. K at 3-4.)  Also audible on the tape was Ms. Roy's son stating he was "very, very scared."  (Def. Ex. K at 11.)

By the time Eunice Police Officer Merimon and Lea County Sheriff's Deputy Stegemoeller arrived, Ms. Roy had calmed down and she was sitting in the back seat of the Impala.  (B. Gross Dep. at 48; 63.)  Officer Merimon reached into the car and patted Ms. Roy on the leg.  (B. Gross Dep. at 63.)  Ms. Roy reacted by lurching toward Officer Merimon.  (B. Gross Dep. at 63-64.)  Officer Merimon then took Ms. Roy to the ground and arrested her.  (B. Gross Dep. at 61.)

The resulting criminal complaint states that Ms. Roy kicked and punched Officer Merimon and knocked off his glasses.  (Roy Dep. at 150.)  Officer Merimon grabbed Ms. Roy's body and neck in order to restrain her on the pavement.  (Roy Dep. at 150-151.)  Both Officer Merimon and Deputy Stegemoeller had to physically restrain Ms. Roy by the arms in order to handcuff her.  (Roy Dep. at 151.)  Ms. Roy was handcuffed with her arms behind her back and transported to the LCDC on charges of aggravated battery on a household member, assault against a household member, and

4

assault upon a police officer.  (B. Gross Dep. at 48; Doc. 76-4, Pl. Undisputed Facts ¶ 5.)

While en route to the LCDC, the sheriff's department notified LCDC staff of Ms. Roy's imminent arrival and of her combative conduct and intoxication.  (Def. Ex. D, Dep. of Jason Davis at 32; 51-52; Def. Ex. E, Dep. of James Chastain at 7-8.)  The sheriff's department also notified LCDC that Ms. Roy had cuts on her hands due to altercations with family members and police. (Def. Ex. H, Dep. of Rick Gaitan at 14.)

Defendant Lt. Jason Davis, the officer in charge at LCDC, and several detention center officers met the sheriff's department vehicle containing Ms. Roy in the sally port.  (Chastain Dep. at 8.)  LCDC Nurse Rick Gaitan also reported to the receiving and discharge area adjacent to the sally port in order to examine the abrasions on Ms. Roy's hands. (Gaitan Dep. at 14.)

Ms. Roy arrived at the LCDC sally port in a sheriff's department vehicle at approximately 1:30 a.m. on December 23, 2007.  (Davis Dep. at 32.)  Ms. Roy was highly intoxicated, combative, and upset.  (Def. Ex. G, Dep. of Lisa Moore at 9-10.)  She was verbally abusive, "cussing at everybody," "yelling" and "irate."  (Davis Dep. at 32-34.)

Ms. Roy refused Deputy Stegemoeller's request to exit the transport vehicle.  (Davis Dep. at 32.)  When LCDC Officer Lisa Moore tried to talk her out of the vehicle, Ms. Roy attempted to kick Officer Moore.  (Moore Dep. at 10.)  Defendant Davis then ordered Ms. Roy out of the vehicle. (Davis Dep. at 34.)  After Ms. Roy again refused, Defendant Davis reached into the vehicle and pulled Ms. Roy out by her left calf and arm.  (Davis Dep. at 34.)  Ms. Roy came out of the vehicle on her feet, still wearing the handcuffs behind her back.  (Davis Dep. at 34.)  Ms. Roy stated: "Fuck y'all.  I have more money than y'all.  I can buy and sell all of y'all."  (Davis Dep. at 34.)  Ms. Roy told Defendant Davis: "I ain't talking to you with your fucked up ears."  (Davis Dep. at 34.)

Defendant Davis held Ms. Roy's left arm with his right hand and walked Ms. Roy to the door

of the detention center. (Davis Dep. at 34, 40.)  Ms. Roy tried to hit Defendant Davis and other

officers with her elbows.  (Davis Dep. at 43.)  LCDC Officer Cody Buford held Ms. Roy's right arm.

(Def. Ex. I, Dep. of Elsie Carreon at 22-23.)  Once inside the LCDC doors, LCDC Officer Elsie

Carreon changed places with Officer Buford in order to take hold of Ms. Roy's right elbow.  (Def.

Ex. E, Chastain Dep. at 11; 18; Carreon Dep. at 24; 27.)

As Officer Moore attempted to take off Ms. Roy's handcuffs–with Defendant Davis on Ms.

Roy's right and Officer Carreon on Ms. Roy's left–Ms. Roy turned to kick Defendant Davis with

her right leg and spit saliva all over his face.  (Moore Dep. at 13; Davis Dep. at 40.)  Ms. Roy was

then taken to the ground, causing her to hit her head and face on the concrete floor.  (Davis Dep. at

41; Doc. 58.)

Exactly how, and with what level of force, Ms. Roy was taken to the ground are factual

issues that remain unresolved.  Ms. Roy stated in her affidavit:

> After I spat in the face of Lieutant [sic] Jason Davis, I remember a great force being
> applied against the back of my head, and going downward toward the concrete floor.
> I also remember waking up in a pool of blood, with a laceration over my left eye.
> I was transported to the local hospital for stitches to my face.  I remember my mouth,
> teeth, jaw, face, cheek, and my head hurt as a result of this incident. . . . It is my
> opinion, that Lieutant [sic] Jason Davis, violently and with unreasonable force
> shoved my face upon the concrete floor of the Lea County Detention Center, causing
> damages to my physical body, mouth, teeth, jaw, face, cheek, and my head.

(Affidavit of Plaintiff Desira D. Roy ¶¶7-10, 13.)

Defendants object to Ms. Roy's affidavit on the grounds that it contradicts her deposition

testimony and statements to a mental health counselor.  According to statements memorialized in

a mental health counselor's client progress monitoring summary, on December 28, 2007, Ms. Roy

told the mental health counselor that "she spit on the jailer and he slammed her into the wall . . ."

and "she does not remember any of the above because she was drunk."  (Doc. 54, Ex. N.)

Ms. Roy testified in her deposition that she does not have a good memory of the things that happened to her and that she blacked out several times.  (Roy Dep. at 121-122.)  Specifically, Ms. Roy testified in her deposition that "I remember he was in back of me and I got a force from the backside of me", and "waking up in a pool of blood."  (Roy Dep. at 165.)

Photos of Ms. Roy "taken on December 24, 2007, which was three (3) days after the incident"[2] demonstrate that Ms. Roy sustained a black left eye.  (Doc. 58-2.)  Additional photos taken at LCDC demonstrate Ms. Roy had swelling and bruising around her left eye.  (Doc. 58-2.) The morning after the incident, Officer Carreon observed that Ms. Roy had a knot on her head and "a little black under her eye."  (Carreon Dep. at 32.)  On December 28, 2007, the mental health counselor observed that Ms. Roy had a black eye, stitches around her eye, and the right side of her face was turning yellow.  (Def. Ex. N.)  At the time of the incident, Ms. Roy was 5'7" tall and weighed approximately 105 pounds.  (Roy Dep. at 146-47.)

Defendant Davis' official report states that he assisted Ms. Roy to the floor with the minimum force necessary under the circumstances.  (Def. Ex. L-1, Davis Report.)  In his deposition, Defendant Davis explained how Ms. Roy was taken to the ground: "Like I said, after she attacked me, spitting in my face, I had a hold [sic] of her left arm with my right hand.  I dropped to one knee and I still had a hold [sic] of her."  (Davis Dep. at 41.)

Officer Moore reported that Officer Carreon's legs became entangled in Ms. Roy's legs and they fell to the concrete floor.  (Moore Dep. at 16-17; Carreon Dep. at 28.)  Officer Moore testified in her deposition that Defendant Davis tried to break Ms. Roy's fall.  (Moore Dep. at 18.)  Officer Carreon then fell on top of Ms. Roy.  (Moore Dep. at 19; Carreon Dep. at 26.)

---

[2] The incident occurred on December 23, 2007.  Three days after the incident would have been December 26, 2007.

Officer Carreon is not sure how Defendant Davis assisted Ms. Roy to the floor; "if he threw her or what."  (Carreon Dep. at 26.)  LCDC Officer James Chastain, who was opening a nearby cell door for Ms. Roy, heard bodies hit the floor.  (Chastain Dep. at 13.)  Nurse Gaitan observed "they all went down to the floor and it became a tangled mess."  (Gaitan Dep. at 24.)  Nurse Gaitan saw Ms. Roy strike her face on the floor.  (Gaitan Dep. at 24-25.)

After the incident, the Officers noticed a large amount of blood on the floor.  (Buford Dep. at 23; Moore Dep. at 20; Gaitan Dep. at 25; Def. Ex. L-4, Report of Officer Carreon.)  Ms. Roy was bleeding from a cut above her left eye.  (Def. Ex. F, Dep. of Cody Buford at 23.)  The cut was about one inch in length.  (Carreon Report.)  Ms. Roy was knocked out and unconscious. (Carreon Dep. at 27; Roy Dep. at 122.)

After Ms. Roy regained consciousness, Nurse Gaitan applied basic first aid and tried to stop the bleeding.  (Chastain Dep. at 18-19; Buford Dep. 23; Gaitan Dep. at 25; Carreon Dep. at 27.)  Officers sat Ms. Roy in a chair and applied an ice pack and bandage.  (Chastain Dep. at 19.)  Ms. Roy complained that her jaw and teeth hurt.  (Carreon Report); (Def. Ex. L-2, Report of Officer Chastain.)  Nurse Gaitan observed that Ms. Roy had superficial abrasions on her knuckles that appeared to be from striking people.  (Gaitan Dep. at 22.)  LCDC officers did not notice any other injuries to Ms. Roy.  (Buford Dep. at 23; Moore Dep. at 20.)

At approximately 2:16 a.m., Officers Buford and Carreon transported Ms. Roy to the local hospital.  (Chastain Dep. at 19; Davis Report.)  Ms. Roy received three stitches on the laceration above her left eye.  (Buford Dep. at 30; Davis Report.)  Ms. Roy was verbally irate at the hospital. (Buford Dep. at 30.)  Officer Buford observed no other injury on Ms. Roy.  (Buford Dep. at 30.) At approximately 4:29 a.m., Officers Buford and Carreon returned to LCDC with Ms. Roy.  (Davis Report.)

After they returned to LCDC, Officer Carreon put Ms. Roy in a cell.  (Carreon Dep. at 29.)
Ms. Roy was cited for assault/battery on an officer and received 69 hours in lock down after the 12-
hour detox time, starting on December 24, 2007, at 1:33 p.m., and ending on December 26, 2007,
at 1:33 p.m.  (Davis Report.)

Defendant Jann Gartman is responsible for supervising all personnel at LCDC.  (Def. Ex.
J, Dep. of Jann Gartman at 6.)  Defendant Gartman was not present at LCDC at the time of the
events at issue.  (Gartman Dep. at 8.)  Defendant Davis, Officer Chastain, Officer Moore and Officer
Carreon completed reports on the incident immediately after it occurred.  (Davis Dep. at 53;
Gartman Dep. at 15; Def. Exs. L1-L4.)  After Defendant Gartman reviewed the reports, it was
determined that no disciplinary action or additional investigation would be taken.  (Gartman Dep.
at 15.)

Defendant Gartman explained, in an affidavit, that there were no recordings made in the
receiving and discharge area, where the incident occurred, on December 23, 2007, the date of the
incident.  (Def. Ex. O, Affidavit of Jann Gartman, ¶¶6-9.)  On that date, there were a total of fifty-
two cameras operating at LCDC.  (Gartman Aff. ¶5.)  Of the fifty-two total cameras, only sixteen
cameras recorded images.  (Gartman Aff. ¶6.)  These sixteen cameras did not record continuously,
but took photos from each camera in turn.  (Gartman Dep. at 9.)  Fourteen of the recording cameras
were in the LCDC housing areas.  (Gartman Aff. ¶7.)  The other two recording cameras were located
in the "Great Hall" of the LCDC.  (Gartman Aff. ¶7.)  The photos from the system recording
cameras were automatically recorded over thirty days after they were taken, which would have been
on January 22, 2008.  (Gartman Dep. at 10.)

The remaining thirty-six cameras were used for live observation only; those cameras could
not, and did not, record anything.  (Gartman Aff. ¶6.)  The receiving and discharge area was

equipped only with a surveillance camera, which provided live feed to the master control room. (Gartman Aff. ¶¶7-8.)  The camera in the area did not record images on December 23, 2007, or at any other time.  (Gartman Aff. ¶¶8-9.)  Defendant Gartman testified in her deposition that there was no video system that reflected the incident that happened on the night at issue.  (Gartman Dep. at 9.)

IV.   **Discussion.**

    (A)   **Defendant Davis is not entitled to qualified immunity.**

    Defendant Davis claims that he is entitled to qualified immunity.  "Once a defendant invokes the defense of qualified immunity, the plaintiff must meet a two-part burden to avoid summary judgment: (1) that the defendant's actions violated a constitutional or statutory right and (2) that the right was clearly established at the time of the defendant's unlawful conduct." *York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008) (quoting *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1150 (10th Cir. 2006) (quotation marks omitted)).  If the plaintiff fails to satisfy either portion of this two-pronged burden, the Court must grant the defendant qualified immunity.  *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003).

    While it is appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (overruling *Saucier v. Katz*, 533 U.S. 194 (2001)).  In *Pearson*, the Court recognized that the sequence set forth in *Saucier* is often appropriate and stated "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 129 S.Ct. at

818.

Recognizing that it is not bound to follow the *Saucier* sequencing, the Court nonetheless finds it appropriate to initially consider whether Ms. Roy has established a constitutional violation. In determining whether Ms. Roy has established a constitutional violation, it is vital to identify the applicable constitutional standard.  In her Amended Complaint for Damages, Ms. Roy alleges use of excessive force and violation of her substantive due process rights.  (Am. Compl. at 3 and 9.) Although Plaintiff advocates for application of the substantive due process standard, the Supreme Court has held "that all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Following *Graham*, the Tenth Circuit has held that the Fourth Amendment bars the use of excessive force during the period immediately following arrest and before the person is taken before a judicial official for a probable cause determination.  *See Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997); *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991), *abrogated on other grounds, Johnson v. Jones*, 515 U.S. 304 (1995).  At the time of the incident, Ms. Roy had not been presented to a judicial officer.  For this reason, the Fourth Amendment, and not substantive due process, governs her claims.  Accordingly, the Fourth Amendment objective reasonableness standard applies herein.

Under the Fourth Amendment standard, the question is whether the defendant's actions were "objectively reasonable" in light of the facts and circumstances confronting him, without regard to underlying intent or motivation. *Graham*, 490 U.S. at 397. The Court explained:

The reasonableness of a particular use of force must be judged from the perspective

11

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight
. . . . The calculus of reasonableness must embody allowance for the fact that police
officers are often forced to make split-second judgments--in circumstances that are
tense, uncertain, and rapidly evolving--about the amount of force that is necessary
in a particular situation.

*Graham*, 490 U.S. at 396-97.

In assessing whether a constitutional violation occurred, the question is "[t]aken in the light
most favorable to the party asserting the injury, do the facts alleged show the officer's conduct
violated a constitutional right?"  *Scott v. Harris*, 550 U.S. 372, 376 (2007).  "In qualified immunity
cases, this usually means adopting . . . the plaintiff's version of the facts."  *Id*. at 378.

Considering Ms. Roy's version of the facts, in the light most favorable to Ms. Roy,
Defendant Davis' actions may not have been "objectively reasonable," in response to the
circumstances confronting him.  Issues of material fact remain unresolved as to the quantum of force
used by Defendant Davis to subdue Ms. Roy, who was undeniably unruly and belligerent.   Ms. Roy
testified in her deposition that she does not have a good memory of the things that happened to her
and that she blacked out several times.  (Roy Dep. at 121-122.)  Specifically, Ms. Roy testified in
her deposition that "I remember he was in back of me and I got a force from the backside of me",
and "waking up in a pool of blood." (Roy Dep. at 165.)  In her affidavit, Ms. Roy elaborated:

> I remember a great force being applied against the back of my head, and going
> downward toward the concrete floor . . . waking up in a pool of blood, with a
> laceration over my left eye.  I was transported to the local hospital for stitches to my
> face . . . . my mouth, teeth, jaw, face, cheek, and my head hurt as a result of this
> incident.

(Affidavit of Plaintiff Desira D. Roy ¶3.)

Defendants object to Ms. Roy's affidavit on the grounds that it contradicts her deposition
testimony and statements to the mental health counselor.  However, setting aside the inconsistencies,
the record, construed in the light most favorable to Ms. Roy, establishes the following material facts:

(1) Defendant Davis took Ms. Roy to the floor; (2) Ms. Roy's face hit the concrete; (3) Ms. Roy was knocked unconscious; (4) Ms. Roy sustained an inch-long laceration above her left eye; (5) Ms. Roy bled profusely; (6) three stitches were required to close the laceration; (7) photos taken in the days following the incident demonstrate that Ms. Roy sustained a left black eye and extensive swelling on her face; (8) Ms. Roy weighed only 105 pounds; and (8) at least three guards were readily available for back up when the injury occurred.  The record, at the current stage of the proceedings, is simply insufficient to allow the Court to determine, as a matter of law, that Defendant Davis' actions were objectively reasonable.

In the context of excessive force claims, "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as [he] did." *Casey*, 509 F.3d at 1286 (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1197 (10th Cir. 2001)). Noting that Ms. Roy has admitted to several grounds that could constitute legitimate justification for Defendant Davis' actions, including her testimony that she was "highly intoxicated, verbally, and physically abusive" and "spat upon the face of Lieutant [sic] Jason Davis," the Court is clearly sympathetic to Defendant Davis.  (Affidavit of Plaintiff Desira D. Roy ¶¶3, 7).  Moreover, the Court acknowledges that great deference is accorded to law enforcement officers who are forced to make split-second judgments in difficult circumstances.  *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008).  Nevertheless, the level of force Defendant Davis used against Ms. Roy remains a question of material fact.  Ms. Roy has met her burden in response to Defendant Davis' assertion of qualified immunity to show that Defendant's actions violated a constitutional right.

Ms. Roy has also satisfied the second requirement to defeat qualified immunity, namely that the right was clearly established at the time of the defendant's unlawful conduct.  *York*, 523 F.3d

at 1209.  The law concerning Ms. Roy's Fourth Amendment right to be free from the use of excessive force during her arrest was clearly established on the date of the incident.  *See Graham*, 490 U.S. at 396-97.  Prior to the incident, the Tenth Circuit had held that the Fourth Amendment bars the use of excessive force during detention after arrest before the person is taken before a judicial official for a probable cause determination.  *See Barrie*, 119 F.3d at 866; *Austin*, 945 F.2d at 1160.

In response to Defendant Davis' assertion of qualified immunity, Ms. Roy has met her two-part burden to avoid summary judgment by showing (1) that Defendant Davis' actions may have violated a constitutional or statutory right and (2) that the right was clearly established at the time of the Defendant Davis' alleged unlawful conduct.  In light of this showing, the granting of summary judgment on qualified immunity grounds would be legally inappropriate.  *See* Fed.R.Civ.P. 56(c).

### (B)   Material issues of fact preclude summary judgment on the excessive force claims.

Defendants have moved for summary judgment on Plaintiff's excessive force claims.  As the moving parties on summary judgment, Defendants bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Trainor*, 318 F.3d at 979; *Adler*, 144 F.3d at 671.  Defendants have not met this burden.

As discussed in Section IV. (A) *supra*, determination of "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. at 396. (citations and some internal quotation marks omitted).

14

Among the factors to consider are (1) the severity of the crime at issue; (2) whether the plaintiff poses an immediate threat to the safety of the officers or others; and (3) whether the plaintiff is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). An assessment of the degree of force actually used is critical to the balancing test used to determine if the force was excessive. *See Garner*, 471 U.S. at 8-9.

In this case, there remain questions of material fact regarding the degree of force Defendant Davis used against Ms. Roy. Defendant Davis' official report states that he "assisted" Ms. Roy to the floor with the minimum force necessary to her actions. (Def. Ex. L-1, Davis Report.)

In his deposition, Defendant Davis explained how Ms. Roy was taken to the ground: "Like I said, after she attacked me, spitting in my face, I had a hold [sic] of her left arm with my right hand. I dropped to one knee and I still had a hold [sic] of her." (Davis Dep. at 41.)

Officer Moore reported that Officer Carreon's legs became entangled in Ms. Roy's legs and they fell to the concrete floor. (Moore Dep. at 16-17; Carreon Dep. at 28.) Officer Moore testified in her deposition that Defendant Davis tried to break Ms. Roy's fall. (Moore Dep. at 18.) Officer Carreon then fell on top of Ms. Roy. (Moore Dep. at 19; Carreon Dep. at 26.)

Officer Carreon testified in her deposition that she was not sure how Defendant Davis assisted Ms. Roy to the floor; "if he threw her or what." (Carreon Dep. at 26.) Nurse Gaitan observed "they all went down to the floor and it became a tangled mess." (Gaitan Dep. at 24.) Based on this record, Defendants have not satisfied their initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.

The Tenth Circuit Court of Appeals has specifically noted that the determination of whether the force used by a law enforcement official is excessive is, generally, a fact question for the jury.

*Buck*, 549 F.3d at 1288.  Because the degree of force used against Ms. Roy remains in dispute, the Court cannot accurately gauge, at this stage of the proceedings, whether the actions of Defendant Davis were objectively reasonable.  Indeed, summary judgment is legally inappropriate where a genuine issue of material fact remains.  *See* Fed. R. Civ. P. 56(c).  This rationale applies equally with respect to Plaintiff's excessive force claim under the New Mexico Constitution.  *See State v. Ellis*, 186 P.3d 245, 253 (N.M. 2008) (applying federal jurisprudence regarding the Fourth Amendment's protections in excessive force context arising under New Mexico law).  Under these facts, a jury would likely find in favor of Defendants, but questions of material fact regarding the degree of force Defendant Davis used against Ms. Roy preclude summary judgment on the excessive force claims.

      **(C)**      **The applicability of the New Mexico Tort Claims Act ("NMTCA").**

Defendants contend that Ms. Roy's state common law claims for excessive and unnecessary force are barred by the NMTCA.  The NMTCA requires that there be an applicable waiver of sovereign immunity for Ms. Roy to proceed on any state law claim against a public employee.  *See* N.M. Stat. Ann. § 41-4-4(A).  Ms. Roy responds that the law enforcement waiver, N.M. Stat. Ann. § 41-4-12, applies to such claims.

Section 41-4-12 waives immunity for injury resulting from specifically named torts or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers acting within the scope of their duties.  *See* N.M. Stat. Ann. § 41-4-12.  In this case, the issue of whether a constitutional violation occurred hinges on a question of material fact regarding the degree of force used against Ms. Roy. *See Buck*, 549 F.3d at 1288.  Without a determination of whether or not excessive force was used against Ms. Roy, the Court cannot determine whether or not the NMTCA bars Ms. Roy's state common law claims for excessive and unnecessary force.  Thus, summary judgment is legally

16

inappropriate on the common law claims for excessive force.  *See* Fed. R. Civ. P. 56(c).

**(D)    The individual capacity claims against Defendant Gartman are dismissed.**

Although direct participation is not necessary for liability under Section 1983, the statute requires an official to cause a citizen to be deprived of her constitutional rights.  *See* 42 U.S.C. § 1983.  "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).  A supervisory relationship alone is insufficient for liability under § 1983.  *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008).

While Defendant Gartman was the Warden of the LCDC at the time of the incident, Defendants have demonstrated that there is no indication that she was personally involved or causally linked to the events in question.  Moreover, Ms. Roy has failed to set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support any claim against Defendant Gartman.  *Serna*, 455 F.3d at 1151.  Indeed, the Amended Complaint does not even include factual allegations linking Defendant Gartman to Ms. Roy's injury or the alleged violations of her rights.  Thus, all claims against Defendant Gartman in her individual capacity must be dismissed.

**(E)    The claims against Lea County must be dismissed.**

As a formal matter, Ms. Roy named "Lea County, State of New Mexico, a County Municipality" as a defendant in the caption and the body of her Complaint and Amended Complaint. (Doc. 1 ¶ 6 and Doc. 49 ¶ 6).  New Mexico law provides that a County must be sued in the name of "The Board of County Commissioners" of the county being sued.  *See* N.M. Stat. Ann. §4-46-1. "Lea County, State of New Mexico, a County Municipality" is not a legal entity, nor is it subject to

suit under New Mexico law.  Thus, all claims against "Lea County, State of New Mexico, a County Municipality," must be dismissed.

> **(F)** **Defendants are not entitled to summary judgment on Plaintiff's official capacity and municipal liability claims.**

Nevertheless, Ms. Roy sued Defendants Davis and Gartman in both their individual and official capacities.  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Therefore, the official-capacity claims against Defendants Davis and Gartman are simply claims against Lea County.  The Tenth Circuit has held if the employee committed no constitutional violation, the claim against the supervisory authority is properly dismissed. *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996); *Webber v. Mefford*, 43 F.3d 1340, 1344-45 (10th Cir. 1994) ("A claim of inadequate training, supervision, and policies under § 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation by the person supervised").  In this case, the question of whether or not a constitutional violation occurred hinges on a factual dispute regarding the level of force used against Ms. Roy.  Thus, summary judgment would be inappropriate on the official-capacity claims.

Similarly, a plaintiff must establish a constitutional violation as a prerequisite to municipal liability.  To establish the liability of a municipal entity, such as Lea County, under §1983 for the actions of a municipal employee, a plaintiff must show that (1) the municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  Moreover, a municipal defendant may not be held liable under Section 1983 for unconstitutional actions of employees below policymaking level based solely on a theory of *respondeat superior*.

*Monell v. Dep't of Social Servs.*, 436 U.S. 658, 663 n.7 (1978).  The following types of municipal policies and practices, however, could give rise to Section 1983 liability in this case: deliberately indifferent training or deliberately indifferent supervision or discipline.  *See City of Canton v. Harris*, 489 U.S. 378, 380 (1989); *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410-11 (1997).

On summary judgment, the moving party has the burden of demonstrating that there is no genuine issue as to any material fact.  As previously articulated, the question of whether or not a constitutional violation occurred hinges on a factual dispute regarding the level of force used against Ms. Roy.  However, Defendants may still be entitled to summary judgment if they demonstrate that a municipal policy or custom was not the moving force behind the alleged constitutional deprivation. *See Jiron*, 392 F.3d at 419.

Defendants presented evidence that it is the policy of the Lea County Detention Center to provide employees with proper training and guidance on the permissible use of force and to ensure that force is only used when necessary and only to the degree necessary to subdue an individual inmate.  (Doc. 54-17).  Moreover, Defendants presented testimonial evidence that employees of the LCDC receive 40 hours of basic detention officer training along with numerous other training classes and that employees are familiar with the policy handbook.  (Davis Dep. at 5-7; Buford Dep. at 5; Def. Ex. G.)  However, Ms. Roy calls into question the quality of the training Lea County provides employees of the Detention Center by pointing to testimonial evidence that training was not provided relative to the handling of intoxicated persons. (Davis Dep. at 5; Def. Ex. G.)  Failure to train detention officers regarding a routine aspect of their job could be reasonably construed as deliberate indifference.  *See City of Canton v. Harris*, 489 U.S. at 381-82.

Similarly, it is factually unclear whether or not Defendant Gartman, who is responsible for supervising all personnel at LCDC, was deliberately indifferent in responding to the incident at

19

issue.  Defendant Davis, Officer Chastain, Officer Moore and Officer Carreon completed reports on the incident immediately after it occurred.  (Davis Dep. at 53; Gartman Dep. at 15; Def. Exs. L1-L4.)  After Defendant Gartman reviewed the reports, she determined that no disciplinary action or additional investigation would be taken.  (Gartman Dep. at 15.)  Whether or not Defendant Gartman's actions were reasonable or deliberately indifferent is almost entirely dependent on the level of force used against Ms. Roy, which is factually in dispute.  Thus, because questions of material fact remain that touch upon municipal liability, summary judgment on the claims against Lea County is legally inappropriate.  *See* Fed.R.Civ.P. 56(c).

**V.      Conclusion.**

Defendants have demonstrated that there is no indication that Defendant Gartman was personally involved or causally linked to the events in question.  For this reason, all claims against Defendant Gartman in her personal capacity must be dismissed.  Additionally, "Lea County, State of New Mexico, a County Municipality" is not a legal entity that can be subject to suit under New Mexico law.  Accordingly, all claims against "Lea County, State of New Mexico, a County Municipality" must be dismissed. Questions of material fact remain that preclude summary judgment regarding all other claims at issue.

**WHEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

20